IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

TYSON FRESH MEATS, INC.,

       Plaintiff,

v.

LAUER LIMITED, L.L.C.; L & L
PORK, INC.; LAUER FINISHING,
L.L.C.; COLERIDGE GRAIN &
FEED, L.L.C.; ROBERT LAUER,
DAVID HANSEN, DALE HANSEN,
ROY D. MILLER, AND JAMES
KUCHTA,

       Defendants.

No. 11-CV-4040-DEO

Memorandum and Opinion Order

---

**TABLE OF CONTENTS**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . 2

II.  FACTS . . . . . . . . . . . . . . . . . . . . . . . 3
     A.  Lauer Limited . . . . . . . . . . . . . . . 5
     B.  Individual Defendants . . . . . . . . . . . 8
     C.  Defendant L & L Pork . . . . . . . . . . . . 9
     D.  Lauer Finishing . . . . . . . . . . . . . . 12
     E.  Coleridge Grain . . . . . . . . . . . . . . 13

III.  PERSONAL JURISDICTION . . . . . . . . . . . . . . 15
     A.  Overview of Plaintiff's Personal Jurisdiction
        Arguments . . . . . . . . . . . . . . . . . 19
     B.  Personal Jurisdiction as to Lauer Limited . . . 21
        1.  General Jurisdiction . . . . . . . . . . 21
        2.  Specific Jurisdiction . . . . . . . . . . 23
     C.  Whether Piercing the Corporate Veil and/or Alter Ego
        Theory Can Confer Jurisdiction Over Shareholders or
        Third Party Entities . . . . . . . . . . . . 24
     D.  Piercing the Corporate Veil and Alter Ego Theory

. . . . . . . . . . . . . . . . . . . . . 25
1. Choice of Law . . . . . . . . . . . . 25
2. Piercing the Corporate Veil . . . . . . . . 29
a. Grossly Inadequate Capitalization . . . 31
b. Solvency/Insolvency at the Time the Debt at
Issue was Incurred . . . . . . . . . 33
c. Diversion by Owners of Entity Funds or
Assets to Their Own or Other Improper Uses
. . . . . . . . . . . . . . . . 35
d. Entity as a Mere Facade for the Personal
Dealings of the Owners and Disregard of
Corporate Formalities . . . . . . . 39
e. Conclusion . . . . . . . . . . . . 40
3. Alter Ego Theory . . . . . . . . . . . 41
a. Whether Coleridge Grain and Lauer Finishing
Control and Have a Sufficient Unity of
Ownership with Lauer Limited Such That
Lauer Limited has an Independent Existence
in Form Only . . . . . . . . . . . 48
E. Intentional Interference with Contract . . . . . 56
1. General Jurisdiction . . . . . . . . . . 57
2. The Calder Effects Test . . . . . . . . . 58

IV.  IMPROPER VENUE . . . . . . . . . . . . . . 62

V.  CHANGE OF VENUE . . . . . . . . . . . . . . 65

VI.  CONCLUSION AND SUMMARY . . . . . . . . . . . . 69

## I.  INTRODUCTION

On May 2, 2011, Tyson Fresh Meats, Inc. (hereinafter "Plaintiff"), filed a Complaint against the original Defendants: Lauer Limited, L.L.C. (hereinafter "Lauer Limited"); L & L Pork, Inc. (hereinafter "L & L Pork"); Robert Lauer, and David Hansen. Docket No. 2. On February

13, 2012, Plaintiff filed their First Amended Complaint, again naming the original Defendants and the following newly added Defendants:  Coleridge Grain & Feed, L.L.C.; Lauer Finishing, L.L.C. (Lauer Finishing); Dale Hansen, Roy Miller, and James Kuchta.  Docket No. 26.

Plaintiff alleges the following causes of action:  (1) breach of contract against all Defendants; (2) unjust enrichment against all Defendants; and (3) intentional interference with contract against L & L Pork, Inc.; Coleridge Grain, L.L.C.; and David Hansen and Robert Lauer.

Currently before this Court, is:  (1) newly added Defendants' Motion to Dismiss Due to Lack of Personal Jurisdiction and Improper Venue, or in the Alternative, Motion for Change of Venue; and (2) original Defendants' Joinder in Motion to Dismiss Due to Improper Venue or, in the Alternative, Motion for Change of Venue, which fully adopts the arguments set forth in their Co-defendants' brief.  Docket No. 30.

## II.  FACTS

Plaintiff is a corporation organized under the laws of the State of Delaware with a packing facility located near Storm Lake, Iowa.  Docket No. 26, 2.  Plaintiff's headquarters

are in Dakota Dunes, South Dakota.  Id.

The United States' hog industry can be broken into four types of operations:  (1) sow/farrowing or birthing operations, (2) nursery operations, (3) finishing operations, and (4) packer/ processing operations.  See Tyson Foods, Inc., Fiscal 2010 Fact Book, available from Tyson Foods, Inc. Plaintiff, as well as acting as a food distributor, maintains pork packing/processing plants, including one in Storm Lake, Iowa.  Id.  A farrowing or birthing operation consists of the care of a sow herd during gestation, farrowing, and lactation. See Iowa State University Extension and Outreach:  Ag Decision Maker, Returns from Farrowing and Finishing Hogs, available at http://www.extension.iastate.edu/agdm/livestock/html/b1-30.h tml, last visited January 15, 2013.  Baby hogs are typically weaned from their mothers at between 19 to 21 days of age. Id.  After being weaned, hogs are generally sold to a nursery where they are housed for approximately "6 weeks before being sold" to a finishing operation as 50 pound feeder pigs.  Id. Finishing operations then house and feed the hogs until they reach approximately 270 pounds, at which point they are sold to processing plants such as Plaintiff.  Id.  From birth to finished pig takes approximately 184 days.  Id.

4

This Court includes this basic information related to the structure of the hog industry to aid in understanding the relationship of the Defendants, which, as will become apparent throughout this Memorandum and Opinion Order, is essential to determining whether this Court can exercise personal jurisdiction over them. The remainder of this Section will consider the nature of each Defendant individually, the relationship between each Defendant, and the actions of each Defendant relevant to Plaintiff's causes of action.

### A. Lauer Limited

Defendant Lauer Limited was a Nebraska Limited Liability Corporation that acted as a hog finishing operation with its principal place of business in Lyons, Nebraska. Docket No. 26, 2. During the relevant time period, the members of Lauer Limited were David Hansen, Dale Hansen, Roy Miller, Robert Lauer, and James Kuchta. Docket No. 26, 3. In July and again in August of 2010, Lauer Limited and Plaintiff entered into "a series of contracts (hereinafter "the Contracts") in which Lauer Limited agreed to deliver 4,800 head of hogs . . . for staggered delivery" to Plaintiff's facility in Storm Lake, Iowa, from February 16, 2011, to November 15, 2011. Docket No. 26-1. The Contracts were signed in the State of Nebraska

by Robert Lauer on behalf of Lauer Limited, and John Wolfgram, a buyer for Tyson, on Tyson's behalf. Docket No. 30-3, 58-59.

On or around September 28, 2010, Lauer Limited's members decided to dissolve the company due to unsustainable losses.[1] Docket No. 26, 8. At the time the decision to dissolve the company was made, Lauer Limited had 8,000 pigs on hand, which was, according to Robert Lauer, approximately, 3,000 head short of what was required pursuant to the Contracts with Tyson. Docket No. 39-2, 48. Also according to Robert Lauer, all of the 8,000 pigs on hand at the time of the decision to

---

[1] In explaining how Lauer Limited got into such a dire economic state, Robert Lauer testified that from 2006 through 2009, Lauer Limited's hogs suffered from virile strains of Porcine Reproductive & Respiratory Syndrome (PRRS) and circovirus. PRRS attacks a pigs immune system, allowing "bacteria and other viruses to proliferate and do damage." *The Pig Site*, Porcine Reproductive & Respiratory Syndrome (PRRS), available at http://www.thepigsite.com/diseaseinfo/97/porcine-reproductive-respiratory-syndrome-prrs, last visited September 5, 2012. There are two varieties of circovirus that have been identified, PCV-1 and PCV-2. *The Pig Site,* Pork Health Fact Sheet - Circovirus Infection in Swine, available at http://www.thepigsite.com/articles/1/health-and-welfare/813/, last visited September 5, 2012. Both strains appear to attack or work in concert with the immune system. Id. The most severe of the two strains, PCV-2, "can cause a wide variety of clinical signs and symptoms." Id.

Robert Lauer also indicated that in the Fall of 2009, despite record harvests, corn prices increased in an unexpected manner but hog prices did not increase at the same pace, resulting in unsustainable input costs. Docket No. 39-2, 48. In addition, throughout 2008 and 2009, Robert Lauer felt costly mistakes were made marketing Lauer Limited's hogs. Docket No. 39-2, 48.

dissolve the company went to fulfill pre-existing contracts with Tyson.  Docket No. 39-2, 49.

Plaintiff alleges it first learned of the members of Lauer Limited's plan to dissolve in November of 2010.  Docket No. 26, 5.  From December 2010, through January of 2011, Robert Lauer expressed his intention to buy-out Lauer Limited's Contracts with Plaintiff or find another party to fulfill the Contracts.  Docket No. 26, 5.  This never occurred, and the Contracts went unfulfilled.  Id.  Plaintiff claims damages pursuant to the breach of the Contracts of not less than $225,000.  Docket No. 26, 11.

Plaintiff also alleges that "[b]efore, during, and after execution of the Contracts," Lauer Limited "functioned as an inadequately capitalized shell company designed to shield the assets" of the other Defendants; that Lauer Limited failed to follow typical corporate formalities when doing business with the other Defendants; that it "shared millions of dollars worth of land, buildings, equipment, labor, and capital" and "effectively operated as" the same entity as some of the other entity Defendants; and that at least three years prior to

entering into the Contracts, it had unsustainable "debt to asset ratios . . . ."[2] Docket No. 26, 4, 5 and 7.

## B. Individual Defendants

The individual Defendants were the members of Lauer Limited. David Hansen and Robert Lauer reside in Hartington, Nebraska. Docket No. 26, 3. Dale Hansen resides in Lincoln, Nebraska. Id. Roy Miller resides in Lyons, Nebraska. Id. James Kuchta resides in Randolph, Nebraska. Id.

Each member of Lauer Limited made an initial capital investment of $54,000.00. Docket No. 39-2, 13. Though certain members took on additional responsibilities according to the testimony of Robert Lauer, the members of Lauer Limited had equal decision making authority. Docket No. 32-2, 11. Throughout the existence of Lauer Limited, the members often paid the expenses of the operation out-of-pocket.[3] At the

---

[2] As of September 30, 2009, Lauer Limited's balance sheet showed assets of $754,587.84 and total long term liabilities of $3,119,983.75. Docket No. 39-2, 32. In 2009, Lauer Limited reported losses of $1,325,745.00. Docket No. 39-2, 44. As of July 1, 2010, Robert Lauer estimated that the total assets of Lauer Limited was approximately $850,000.00 and the total liabilities was above $3,300,000.00. Docket No. 39-2, 34 and 35.

[3] On June 15, 2010, Lauer Limited payed L and L Pork, owned by Robert Lauer, $30,000.00 as reimbursement for a short term loan. Docket No. 39-2, 42. On December 10, 2010, Lauer Limited wrote a check to L & L Pork for $50,000.00 as repayment of a short term loan. Docket No. 39-2, 38. On

dissolution of Lauer Limited, the members took out a loan for $1,200,000.00, in order to cover Lauer Limited's existing obligations. Docket No. 39-2, 14. By the terms of the note, each member became personally liable for the $1,200,000.00 amount. <u>Id.</u> At the conclusion of Lauer Limited's dissolution, all of Lauer Limited's obligations, including feed costs, vet fees, building rent, etc., were paid in full with the exception of its obligation to Tyson. Docket No. 39-2, 54. Robert Lauer testified that the members of Lauer Limited made a conscious decision to make good on all of its existing obligations but its obligation to Tyson. Docket No. 39-2, 54.

## C. Defendant L & L Pork

Defendant L & L Pork "is a Nebraska Limited Liability Corporation with its principal place of business in Hartington, Nebraska." Docket No. 26, 2. The members of L & L Pork are Robert Lauer, President and Director, and Robert Lauer's wife, Secretary and Director. <u>Id.</u> L & L Pork was,

---

December 30, 2010, Lauer Limited wrote a check to David Hansen for $167,917.38 as a reimbursement for feed bought for Lauer Limited's hogs. Docket No. 39-2, 37. On at least two separate occasions Lauer Limited paid back Roy Miller $48,000.00 and $27,686.37, respectively. Docket No. 39-2, 43.

during the relevant time period, a farrowing operation, selling 18 day old pigs almost exclusively to Lauer Limited.[4] Docket No. 30-3, 111.

Plaintiff alleges that L & L Pork and Lauer Limited "effectively" operated as a "single entity." Docket No. 26, 7. Plaintiff also alleges that L & L Pork failed to follow typical corporate formalities when doing business with Lauer Limited. Docket No. 26, 5.

Pursuant to a contract which expired in 2004, Lauer Limited purchased hogs from L & L Pork for $28[5] per hog. Docket No. 39-2, 7. The contract also included a clause preferential to Lauer Limited; the clause provided that it was the intention of the parties that Lauer Limited was to earn at least $3 per hog, suggesting that if Lauer Limited was not

---

[4] Robert Lauer testified that L & L Pork sold hogs to a Mr. Mullenhoff and a Mr. Sohler, as well as Lauer Limited, in 2010. Mr. Lauer estimated that 95% of L & L Pork hogs were sold to Lauer Limited. Docket No. 30-3, 111.

Sometime in the Fall of 2010, L & L Pork liquidated its sow herd. Docket No. 39-2, 26. Currently, L & L Pork rents its farrowing unit to a third party. Docket No. 39-2, 5.

[5] According to the testimony of Robert Lauer, this price at some point changed to $30 per hog pursuant to a verbal agreement. Docket No. 39-2, 7.

When L and L Pork started selling its hogs to a third party, they sold them for $40 per head, suggesting the $30 per head price offered Lauer Limited was favoritism reflecting Robert Lauer's ownership interest in both entities. Docket No. 39-2, 28.

earning at least $3 per hog, the price L and L Pork received per hog would decrease.[6]  Docket No. 39-2, 8.  L and L Pork, along with Robert Lauer, individually, provided free labor to Lauer Limited which had no employees of its own.[7]  Docket No. 39-2, 28.  Plaintiff also alleges "L & L Pork made approximately 107 loans to Lauer Limited[,] totaling about $1,900,000 during a two-year period from September 2008[,] through September 2010."[8]  Docket No. 26, 7.

In October of 2010, rather than selling its hogs to Lauer Limited, L and L Pork began selling its hogs to a third party. Docket No. 39-2, 6.  In his deposition, Robert Lauer admitted that, had Lauer Limited not dissolved, those hogs would have been sold to Lauer Limited and used to fulfill the Contracts

_____

[6] This preferential term appears to have been honored, at least to some extent, up through Lauer Limited's dissolution in 2010.  For instance, Robert Lauer testified that in December of 2010, Lauer Limited wrote a check to L and L Pork for $40,000.00 for the overpayment of pigs.  Docket No. 39-2, 39.

[7] From September of 2008, to September of 2009, L and L Pork paid $193,907.03 in salaries and wages.  Docket No. 39-2, 4.  It is unclear from the record how much of these salaries and wages reflected labor on behalf of Lauer Limited and how much reflected labor on behalf of L and L Pork.

[8] The record currently before this Court does reflect that L and L Pork often covered substantial portions of Lauer Limited's expenses, though it does not reflect the exact amount of 1.9 million.  Docket No. 39-2, 37, 38, and 42.

here at issue.  Docket No. 39-2, 36.

### D.  Lauer Finishing

Defendant Lauer Finishing "is a Nebraska Limited Liability Corporation with its principal place of business in Hartington, Nebraska."  Id.  Robert Lauer and his wife own Lauer Finishing, and Robert Lauer acts as its managing member. Id.

Lauer Finishing was incorporated solely for the purpose of purchasing land and finish barns to be rented to third parties.  Docket No. 39-2, 26.  As of 2010, Lauer Finishing owned 25 acres of land, upon which were situated the 8 finishing barns utilized by Lauer Limited in its hog finishing operation.  Docket No. 39-2, 26.  Initially, Lauer Finishing rented its finishing barns to Lauer Limited pursuant to a contract, but the contract expired in 2005.  Docket No. 39-2, 53.  As of 2010, there was no formal rental agreement between Lauer Limited and Lauer Finishing.  Docket No. 39-2. According to the expert opinion of Mr. Robert L. Kirchner, a Certified Fraud Examiner, Lauer Limited paid Lauer Finishing $19,000.00 per month in rent.  Docket No. 23-13, 6.  Also as

of 2010, Lauer Finishing did not have any salaried employees. Docket No. 39-2, 52.

### E. Coleridge Grain

Defendant Coleridge Grain "is a Nebraska Limited Liability Corporation with its principal place of business in Coleridge, Nebraska." Docket No. 26, 3. During the relevant time period, Robert Lauer, David Hansen, and Brian Eddie each owned equal 1/3 interests in Coleridge Grain. Docket No. 39-2, 6.

Coleridge Grain operated as a grain bank, hog feed producer, and hog trucking company. Docket No. 39-2, 30, 42, and 43. During the relevant time period, Coleridge Grain had approximately 5 to 7 customers for which it stored grain and produced food, including Lauer Limited and L and L Pork. Docket No. 39-2, 41. According to Robert Lauer, Coleridge Grain's customers would purchase grain, premix, and drugs and deliver them to Coleridge Grain for storage. Docket No. 39-2, 41. Coleridge Grain would then mix and grind the ingredients on the customers behalf, who would then be responsible for picking up the finished feed. Docket No. 39-2, 41 and 42. Coleridge Grain also owned 2 hog trailers and 4 semis. Docket No. 34-1, 30. David Hansen testified that Coleridge Grain

hauled for Lauer Limited, his own finishing operation (Hansen Hog Haven), Paulson Pork, and a Mr. Broberg, as well as occasionally covered for other trucking companies that were unable to fulfill their obligations. Docket No. 34-1, 30.

Pursuant to the Contracts with Plaintiff, Lauer Limited was to arrange for the delivery of hogs to Plaintiff's facility in Storm Lake, Iowa. Docket No. 34-2, 2. Lauer Limited typically utilized the services of Coleridge Grain to deliver its hogs to Plaintiff. Docket No. 34-1, 30. Plaintiff would then pay Coleridge Grain upon delivery. Docket No. 34-2, 2.

As previously noted, Coleridge Grain also produced Lauer Limited's feed. Docket No. 39-2, 41. Upon dissolution, Lauer Limited owed Coleridge Grain $727,332.53 for services.[9] Docket No. 39-2, 37. Robert Lauer has admitted that had he and David Hansen not been part owners of Coleridge Grain, the feed bill would not have been allowed to grow so large and be paid so late. Docket No. 39-2, 43. In other words, Coleridge Grain gave Lauer Limited preferential treatment based on the

---

[9] The Plaintiff contends that Defendant was purchasing grain from Coleridge Grain. However, the record is clear that Coleridge Grain's customers bought the grain, as well as any other ingredients that would constitute the final feed product, and Coleridge Grain merely provided storage and mixed and ground the feed ingredients.

common ownership between the two companies.

On December 1, 2010, Robert Lauer sold his interest in Coleridge Grain for $108,000.00. Docket No. 39-2, 54. 50% of his shares went to David Hansen and 50% of his shares went to Brian Eddie, leaving Mr. Eddie and Mr. Hansen 50/50 owners. Docket No. 50. Though not an express condition of the sale, it was understood at the time of the sale that Lauer Limited would do all it could to pay off its feed bill. Docket No. 39-2, 54. On December 30, 2010, Lauer Limited did indeed pay off its $727,332.53 feed bill in full. Docket No. 39-2, 37.

In December of 2010, Coleridge Grain purchased Lauer Limited's remaining hogs. Docket No. 39-2, 39. Though Plaintiff insinuates that this in some manner interfered with their contracts with Lauer Limited, the record is clear that these hogs were not slated to fulfill the Contracts here at issue and that Coleridge Grain in fact delivered the hogs in question once finished to Plaintiff in fulfillment of other contracts between Lauer Limited and Tyson. Docket No. 39-2, 39; see also Docket No. 50 and 51.

## III.  PERSONAL JURISDICTION

An action may be dismissed for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure

12(b)(2).  The party asserting personal jurisdiction has the burden to make a *prima facia* showing that jurisdiction is proper.  <u>Viasystems, Inc. v. EBM-Papst St. Georgen GMBH & Co., KG</u>, 646 F.3d 589 (8th Cir. 2011).  A court considering whether personal jurisdiction is proper must view the evidence then available in a light most favorable to the party asserting jurisdiction and resolve all factual conflicts in favor of that party.  <u>Goss Graphic Systems, Inc. v. Man Roland Druckmaschinen Aktiengesellschaft</u>, 139 F. Supp. 2d 1040 (N.D. Iowa 2001) (citing <u>Dakota Industries, Inc. v. Dakota Sportswear, Inc.</u>, 946 F.2d 1384, 1387 (8th Cir. 1991)).

As a threshold issue, in order for a federal court to exercise personal jurisdiction, the forum state's long-arm statute must provide sufficient grounds.  <u>See</u> <u>Romak USA, Inc. v. Rich</u>, 384 F.3d 979, 984 (8th Cir. 2004).  If personal jurisdiction is proper under the forum state's long-arm statute, the exercise of personal jurisdiction must still comport with a defendant's constitutional Due Process Rights. <u>Id.</u>

Iowa Rule of Civil Procedure 1.306 provides for personal jurisdiction over a defendant to the full extent of the Constitution.  <u>Med-Tec, Inc. v. Kostich</u>, 980 F. Supp. 1315

(N.D. of Iowa 1997).  Thus, the question here presented is whether forcing newly added Defendants to defend themselves in the United States District Court for the Northern District of Iowa would violate their constitutional due process rights.

The Due Process Clause requires that a defendant "have certain minimum contacts with" a forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  <u>International Shoe Co. v. State of Washington</u>, 326 U.S. 310, 316 (1945) (quoting <u>Milliken v. Meyer</u>, 311 U.S. 457, 463 (1940)).  Minimum contacts are contacts, ties or relations with a forum State such that a defendant "should reasonably anticipate being haled into court there."  <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 299 (1980).  Traditional notions of fair play and substantial justice refer to the reasonableness of requiring a defendant "to defend a particular suit" in the forum in which it is brought.  <u>Id.</u> at 292 (citing 326 U.S. at 292).  A determination of whether the exercise of personal jurisdiction is ultimately reasonable requires a court to consider the defendant's burden of defending in the forum state, as well as:

> the forum State's interest in adjudicating the dispute . . . the plaintiff's interest

> in obtaining convenient and effective
> relief . . . the interstate judicial
> system's interest in obtaining the most
> efficient resolution of controversies; and
> the shared interest of the several States
> in furthering fundamental substantive
> social policies . . . .

Id. (internal citations omitted).

The Supreme Court has recognized the existence of two types of personal jurisdiction: specific and general. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984). Specific jurisdiction refers to the exercise of "personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." Id. at 414, fn. 8. General jurisdiction occurs when, though the suit may not arise out of a defendant's contacts with the forum, the defendant's independent contacts with the forum are so "continuous and systematic" that the exercise of personal jurisdiction as to any cause of action remains justified. Id. at 415 (citations omitted). Thus, the distinction between specific and general jurisdiction is a recognition that fairness requires more or less contacts with a forum depending on whether the conduct of the defendant at

issue is part of the purported basis for personal jurisdiction.

In interpreting and synthesizing Supreme Court case law, the Eighth Circuit has identified five factors to be considered when determining whether an exercise of jurisdiction comports with constitutional Due Process:

> (1) the nature and quality of the [defendant's] contacts with the forum state; (2) the quantity of the [defendant's] contacts with the forum state; (3) the relation of the cause of action to the [defendant's] contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

Dakota Industries, Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1390 (8th Cir. 1991) (citing Land-O-Nod Co. v. Bassett Furniture Industries, 708 F.2d 1338 (8th Cir. 1983)).

The first three factors are the predominant "factors, and the remaining two factors are secondary . . . ." Johnson v. Arden, 614 F.3d 785, 794 (8th Cir. 2010) (citation omitted). A court must look at all of the factors together and "examine the totality of the circumstances in making a personal-jurisdiction determination." Id.

**A.    Overview of Plaintiff's Personal Jurisdiction Arguments**

The Plaintiff first argues this Court has personal

19

jurisdiction over the newly added Defendants as to its breach of contract and unjust enrichment causes of action because this Court is entitled to pierce Lauer Limited's corporate veil and/or Lauer Limited is the alter ego of the newly added Defendants. In other words, Plaintiff contends Lauer Limited's contacts and the newly added Defendants' contacts are one and the same; and, because this Court has personal jurisdiction over Lauer Limited, this Court has personal jurisdiction over the newly added Defendants. However, Plaintiff's argument raises three issues: (1) Does this court have personal jurisdiction over Lauer Limited in the first place? (2) Would piercing Lauer Limited's corporate veil and/or determining Lauer Limited is the alter ego of the newly added Defendants allow this Court to treat Lauer Limited's contacts as the contacts of the newly added Defendants? and (3) Has Plaintiff presented a prima facie case justifying piercing Lauer Limited's corporate veil and/or declaring Lauer Limited the alter ego of the newly added Defendants? These issues are addressed sequentially within Sections III(B) (pgs. 21-24), III(C) (pgs. 24-25), and III(D) (pgs. 25-56) of this Memorandum and Opinion Order.

Plaintiff also contends this Court is entitled to exercise specific jurisdiction over Coleridge Grain because it intentionally interfered with the Contracts here at issue.[10] This argument is dealt with in Section III(E) (pgs. 56-62) of this Memorandum and Opinion Order.

## B. Personal Jurisdiction as to Lauer Limited

As previously noted, the Supreme Court has recognized that a Court can have two types of personal jurisdiction: (1) general, and (2) specific. Plaintiff does not contend Lauer Limited is subject to this Court's general jurisdiction. However, because this issue affects much of the analysis necessary to address other issues facing this Court, this Court will first determine whether it may exercise general jurisdiction over Lauer Limited.

### 1. General Jurisdiction

It is undisputed that Lauer Limited was "a Nebraska Limited Liability Corporation with its principal place of business in Lyons, Nebraska." Docket No. 26, 3. Plaintiff's

---

[10] Plaintiff does not contend that the other newly added Defendants, Lauer Finishing, Dale Hansen, Roy Miller, and James Kuchta, intentionally interfered with its contracts. See Docket No. 26. However, Plaintiff has implied that its intentional interference contract claim applies to all Defendants but has yet to formally motion the Court to add them as parties to the claim. Docket No. 44, 7.

principal place of business is in Dakota Dunes, South Dakota. Docket No. 34-1, 2. Entering into the Contracts here at issue is the only contact Plaintiff alleges Lauer Limited had with the State of Iowa. See Docket No. 26. All of the discussions and negotiations relating to the Contracts occurred in Nebraska between Plaintiff's agent stationed in Nebraska and representatives of Lauer Limited. Docket No. 39-2. In addition, the Contracts were actually signed in Nebraska; and the hogs that were subject to the Contracts were entirely raised in Nebraska. Docket No. 30-3, 58-59 and Docket No. 39-2. Thus, the record indicates Lauer Limited's only actual contact with the State of Iowa was the Contracts' requirements that Lauer Limited arrange for delivery of the hogs to Storm Lake, Iowa; however, the actual delivery of the hogs was undertaken by Coleridge Grain, not Lauer Limited; and the Plaintiff, not Lauer Limited, paid for those deliveries. Docket No. 34-1, 30 and Docket No. 34-2, 2.

Given Lauer Limited's limited contacts with the State of Iowa, this Court is persuaded that it lacks general jurisdiction over Lauer Limited. See Hall-Magner Group v. Convocation Flowers, Inc., 2012 WL 3069782, 4 (S.D. Cal. 2012) (holding that the occasional delivery of flowers into a

jurisdiction is "not sufficient to create general jurisdiction . . . ."); <u>Smith Enterprise, Inc. v. Capital City Firearms</u>, 2003 WL 2561882, 2 (D. Ariz. 2008) (holding that a company with 40 clients to whom they deliver goods within the forum was not subject to the forum's general jurisdiction absent additional contacts); and <u>Bearry v. Beech Aircraft Corp.</u>, 818 F.2d 370, 376 (5th Cir. 1987) (holding that the "flow" of a company's products into a state "does not create a general presence in that state . . . .").

## 2. Specific Jurisdiction

Though Coleridge Grain actually brought the hogs to Iowa rather than Lauer Limited, it has long been accepted that a "lack of physical presence" in a forum does not necessarily defeat personal jurisdiction. <u>Kinsella v. Belforte, II</u>, 373 F. Supp. 2d 957, 964 (S.D. Iowa 2005); <u>see also Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 476 (1985) ("Jurisdiction . . . may not be avoided merely because the defendant did not *physically* enter the forum State"). The Contracts required Lauer Limited to arrange for delivery of hogs to Storm Lake, Iowa. It was Lauer Limited, not Plaintiff, that sub-contracted Coleridge Grain to make the deliveries. It is settled law that "[a] delivery term that requires a

nonresident defendant to deliver an item to a plaintiff in the plaintiff's forum state supports the existence of personal jurisdiction over the nonresident defendant." <u>K-V Pharmaceutical Co. v. J. Uriach & CIA, S.A.</u>, 648 F.3d 588 (8th Cir. 2011); <u>see</u> <u>also</u> <u>Papachristou v. Turbines, Inc.</u>, 902 F.2d 685, 686 (8th Cir. 1990) (providing that a contract term calling for delivery of goods within a forum state was sufficient, despite a lack of other contacts, to give the forum specific jurisdiction over the defendant). Therefore, though this Court lacks general jurisdiction over Lauer Limited, this Court does have specific jurisdiction over Lauer Limited as to Plaintiff's breach of contract and unjust enrichment causes of action.

**C.  Whether Piercing the Corporate Veil and/or Alter Ego Theory Can Confer Jurisdiction Over Shareholders or Third Party Entities**

In <u>Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.</u>, the Eighth Circuit held that when a subject entity's corporate veil has been pierced, jurisdiction over the subject entity "will support jurisdiction over the stockholders." 519 F.2d 634, 638 (8th Cir. 1975); <u>see</u> <u>also</u> <u>Select Comfort Corp. v. Innovation Ads, Inc.</u>, 2011 WL 31715

24

(D. Minn. 2011) (stating that "[a] court may find personal jurisdiction over a defendant through piercing the corporate veil").  In Epps v. Stewart Information Services Corp., the Eighth Circuit stated that "[p]ersonal jurisdiction can be properly asserted over a corporation if another is acting as its alter ego, even if that alter ego is another corporation." 327 F.3d 642, 649 (8th Cir. 2003).  Thus, as to Plaintiff's breach of contract and unjust enrichment causes of action, alter ego and/or piercing the corporate veil theory is sufficient to subject the newly added Defendants to the personal jurisdiction of this Court, as long as Plaintiff succeeds in making prima facie showing that Lauer Limited's corporate veil should be pierced and/or Lauer Limited is the alter ego of the newly added Defendants.

### D.  Piercing the Corporate Veil and Alter Ego Theory

#### 1.  Choice of Law

As a threshold matter, this Court must determine whether to employ Iowa or Nebraska law when piercing the corporate veil and/or applying alter ego theory.  A "federal district court must apply the conflict of law rules of the state in which it sits."  Modern Leasing, Inc., of Iowa v. Falcon Mfg. Of California, Inc., 888 F.2d 59, 62 (8th Cir. 1989) (citing

<u>Klaxon Co. V. Stentor Electric Mfg. Co.</u>, 313 U.S. 487, 496 (1941)). "The Iowa courts have generally adopted the 'most significant relationship' rule in the choice of law area . . . ." <u>Sedco Intern., S.A. v. Cory</u>, 522 F. Supp. 254, 313 (S.D. Iowa 1981) (quoting <u>Berghammer v. Smith</u>, 185 N.W.2d 226, 230 (Iowa 1971)). The most significant relationship rule requires a court "'to apply to any issue in litigation the law of the state which has the most significant relationship with the parties and the principal interest in the issue . . . .'" <u>Id.</u> at 231.

While neither the Iowa Courts nor the Eighth Circuit has determined which states' law applies to questions of piercing the corporate veil or alter ego theories in cases involving an Iowa plaintiff and out-of-state entity defendant, this Court, after reviewing relevant case law, is persuaded that because Lauer Limited is a Nebraska entity, Nebraska law applies. Most jurisdictions recognize the internal affairs doctrine whereby "'the law of the state of incorporation" is used to determine "issues relating to the internal affairs of a corporation;'" and this Court is persuaded that Iowa courts, if presented the opportunity, would do the same. <u>Matson Logistics, L.L.C. v. Smiens</u>, 2012 WL 2005607, 5 (D. Minn. June

5, 2012) (quoting <u>Rupp v. Thompson</u>, 2004 WL 3563775, 3 (D. Minn. Mar. 17, 2004)); <u>See also Kalb, Voorhis & Co. v. Am. Fin. Corp.</u>, 8 F.3d 130, 132 (2d Cir. 1993) ("The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders . . . ."); <u>Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec</u>, 529 F.3d 371, 378 (7th Cir. 2008) (noting that "Texas has the same choice-of-law rule for veil-piercing as Illinois, namely that the law of the state of incorporation governs such claims"); <u>Tomlinson v. Combined Underwriters Life Ins. Co.</u>, 2009 WL 2601940, 3 (N.D. Okla. August 21, 2009) (noting that "the majority of jurisdictions addressing this question have also applied the law of the state of incorporation to veil-piercing issues") and <u>MHC Investment Co. v. Racom Corp.</u>, 254 F. Supp. 2d 1090 (S.D. Iowa 2002) (applying the internal affairs doctrine to an out-of-state entity in a breach of fiduciary duty context). Though the parties' Contracts called for delivery in Iowa, which would generally imply Iowa contract law applies, the internal affairs doctrine still specifically applies to piercing the corporate veil and/or alter ego theories because whether or not the independence of an out-of-state entity will be

respected "'is collateral to and not part of the parties' negotiations or expectations with respect to the contract.'" Id. at 6 (quoting Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F. Supp. 345, 348 (M.D.N.C. 1995). The internal affairs doctrine also has the added benefit of recognizing that the state of organization generally "'has the greater interest in determining when and if'" limited liability may "'be stripped away'" from an entity organized pursuant to its laws. Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F. Supp. 345, 349 (M.D.N.C. 1995) (quoting Soviet Pan Am Travel Effort v. Travel Committee, Inc., 756 F. Supp. 126, 131 (S.D.N.Y. 1991)). Finally, the internal affairs doctrine "provides consistency and predictability to" an entity and its owners; if an entity were potentially subject to piercing the corporate veil and/or alter ego theories of each and every state, consistency and predictability would be eviscerated, rendering investment prohibitive. Id.; see also Restatement (Second) Conflict of Laws, Section 302) ("Matters internal to a corporation's affairs, such as holding shareholders or directors personally liable, is a matter best left to the laws of one state. Otherwise, shareholders or the corporation could be faced with conflicting demands from various states").

Thus, in determining whether Lauer Limited's Corporate Veil may be pierced or whether Lauer Limited is the alter ego of the newly added Defendants, this Court will apply Nebraska law.

### 2. Piercing the Corporate Veil[11]

Under Nebraska law, an entity is generally "viewed as . . . . complete and separate . . . from its shareholders and officers, who are not, as a rule, liable for" its "debts and obligations . . . ." <u>Christian v. Smith</u>, 276 Neb. 867 at 883 (Neb. 2008) (citing <u>Baye v. Airlite Plastics Co.</u>, 260 Neb. 385 (Neb. 2000)). Courts will generally respect the separateness of an entity and its shareholders "until sufficient reason to the contrary appears." <u>Id.</u> (citing <u>Southern Lumber & Coal Co. v. M.P. Olson Real Estate and Construction Co.</u>, 229 Neb. 249 (Neb. 1988)).

Under a piercing the corporate veil theory, a plaintiff "must allege and prove that" the target entity "was under the

---

[11] As previously noted, the members of Lauer Limited include Robert Lauer, David Hansen, Dale Hansen, Roy D. Miller, and James Kuchta. Defendants Dale Hansen, Roy D. Miller, and James Kuchta are the "newly added" Defendants requesting a Motion to Dismiss for Lack of Personal Jurisdiction, and Plaintiff contends that jurisdiction is appropriate as to these newly added Defendants because their contacts are the contacts of Lauer Limited due to piercing the corporate veil and/or alter ego theory.

actual control of the shareholder[s] and that the shareholder[s] exercised such control to commit a fraud or other wrong in contravention of the plaintiff's rights." Id. (citing Baye, 260 Neb. 385).

Fraud, in the context of piercing the corporate veil, requires a plaintiff to show that the entity and/or shareholders' conduct was imbued with the "badges, signs, indicators, or indica of fraud . . . ." J.L. Brock Builders, Inc. v. Dahlbeck, 223 Neb. 493, 498 (Neb. 1986). Badges, indicators, and indica of fraud are not the same as proof of actual criminal fraud but "are facts" with the "tendency to show the existence of fraud . . . ." Gifford-Hill & Co. v. Stoller, 221 Neb. 757, 764 (Neb. 1986) (citing and quoting from Montana Nat'l Bank v. Michels, 193 Mont. 295 (Mont. 1981)). It is sufficient that the facts in question "furnish . . . a reasonable inference of fraud, according to the weight to which they may be entitled from their intrinsic character and the special circumstances attending the case." Id. When the fraud is not apparent, Nebraska courts look to the following factors to determine whether the inference of fraud is sufficiently strong:

> (1) Grossly inadequate capitalization; (2) Insolvency of the debtor corporation at the

30

time the debt is incurred; (3) Diversion by
the shareholder or shareholders of
corporate funds or assets to their own or
other improper uses; and (4) The fact that
the corporation is a mere facade for the
personal dealings of the shareholder and
that the operations of the corporation are
carried on by the shareholder in disregard
of the corporate entity.[12]

J.L. Brock Builders, 223 Neb. at 498. (quoting United States
National Bank of Omaha v. Rupe, 207 Neb. 131, 135 (Neb.
1980)).

In this case, Plaintiff does not allege and the record

does not support a finding of fraud per se. Thus, this Court

must consider the factors the Nebraska Supreme Court outlined

in National Bank of Omaha. 207 Neb. at 135.

### a. Grossly Inadequate Capitalization

Inadequate capitalization refers to "capitalization very

small in relation to the nature of the business of the

corporation and the risks entailed." Christian v. Smith IV,

759 N.W.2d 447, 462 (Neb. 2008). It is "measured at the time

of incorporation" and does not refer to capital added to cover

entity expenses at later dates. Id. Entity losses, though

relevant if excessive, do not necessarily translate into

---

[12] "These factors 'are not acts of fraud in themselves
but, rather, are elements of circumstantial proof of fraud.'"
MeccaTech, Inc. v. Kiser, 2008 WL 1774992, 10 (D. Neb. 2008)
(quoting Medlock, 642 N.W.2d 113, 124 (Neb. 2002)).

inadequate capitalization. Id. "Undercapitalization presents a question of fact that turns on the nature of the business of the particular corporation." Id.

As previously indicated, David Hansen, Dale Hansen, Roy Miller, Robert Lauer, and James Kuchta were the members of Lauer Limited. Docket No. 26, 3. Of these members, only Dale Hansen, Roy Miller, and James Kuchta explicitly assert that piercing the corporate veil is inappropriate. Docket No. 30. Each member of Lauer Limited made an initial capital contribution of $54,000.00. Docket No. 39-2, 13. Hog markets are highly volatile and typically require significant, up-front capital investments. See Mark Greenwood, Managing Volatility is Job No. 1, National Hog Farmer, available at http://nationalhogfarmer.com/marketing/managing-volatility-job-no-1, last visited January 15, 2013. Throughout its existence, Lauer Limited's only assets consisted of its hog inventory. Docket No. 39-2, 32, 34, and 35. All of the land and associated buildings Lauer Limited utilized were owned by Lauer Finishing. Docket No. 39-2, 26. The record indicates that each members' $54,000.00 initial capital contribution paled in comparison to the operating costs of Lauer Limited, which included grain, feed production,

rent for the finishing barns, electricity bills, management fees, professional marketing fees, and veterinary fees. Docket No. 39-2. Throughout the relevant time period, the members of Lauer Limited, either individually or through related entities, were forced to pay a significant amount of company expenses out-of-pocket to keep the company afloat. Docket No. Docket No. 39-2, 37, 38, 42, and 43. Upon final dissolution of Lauer Limited, the members of Lauer Limited were forced to pay Lauer Limited's outstanding obligations through a $1,200,000.00 loan which obligated each member individually. Docket 39-2, 14. All of these facts strongly indicate Lauer Limited was grossly, inadequately capitalized.

**b. Solvency/Insolvency at the Time the Debt at Issue was Incurred**

An entity "is insolvent if it is unable to pay its debts as they become due in the usual course of its business, or if it has an excess of liabilities . . . over its assets at fair valuation." Smith IV, 759 N.W.2d at 463. The record indicates Lauer Limited failed this test on both counts.

As previously noted, the members of Lauer Limited had to repeatedly infuse money into the company in order to pay for its debts when they became due. Docket 39-2, 37, 38, 42, and

33

43.   As one example, the record generally supports Plaintiff's allegation that "L & L Pork," which was owned solely by Robert Lauer and his wife, made approximately 107 loans to Lauer Limited, totaling about $1,900,000.00, during a two-year period from September 2008, through September 2010. Docket No. 26, 7.   In 2008, Lauer Limited reported losses of $641,948.   Docket No. 39-2, 45.   In 2009, Lauer Limited reported losses of $1,325,745.00.[13]   Id.   As of September 30, 2010, Lauer Limited's checking account was overdrawn by $19,324.38.   Docket No. 39-2, 32.   Also as of September 30, 2010, Lauer Limited had a Coleridge Grain bill of $363,010.21, which was more than 90 days overdue; and Robert Lauer admitted that this debt would not have been allowed to grow so large had Coleridge Grain not been owned in part by David Hansen and himself.   Docket No. 39-2, 43.   Finally, just prior to Lauer Limited's final dissolution on December 30, 2010, Lauer Limited's outstanding bill with Coleridge Grain had ballooned to $727,332.53.   Docket No. 39-2, 39.   All of these facts strongly indicate Lauer Limited was unable to pay its bills as

---

[13] Robert Lauer testified that a significant amount of these losses were due to a change in Lauer Limited's accounting practices (they changed to a fixed valuation of hogs), rather than actual losses.   Docket No. 39-2, 44.   He estimated that they probably actually lost between $600,000.00 and $700,000.00.   Id.

they became due in the regular course of business when it entered into the Contracts with Tyson in July of 2010.

Lauer Limited's liabilities also greatly exceeded its assets. Docket No. 39-2, 32, 34, 35, and 44. As of December 31, 2009, Lauer Limited had $3,547,710.63 in liabilities and assets valued at $774,943.29. Docket No. 39-2, 32. As of July 2010, when the Contracts became effective, Robert Lauer estimated that Lauer Limited had liabilities in excess of $3,300,000.00 and assets of approximately $850,000.00. Docket No. 39-2, 34 and 35.

Thus, at the time it entered the Contracts with Tyson, Lauer Limited was insolvent, in that it both could not pay its debts in the ordinary course of business and had liabilities that greatly exceeded its assets.

### c. Diversion by Owners of Entity Funds or Assets to Their Own or Other Improper Uses

Improper diversion of an entity's assets or funds occurs when an owner of the entity "appropriates and uses [entity] funds and property for his personal purposes and thereby defrauds and causes damages to creditors . . . ." Smith IV, 759 N.W.2d at 463.

The record indicates Lauer Limited had no funds to

appropriate; on the contrary, the members of Lauer Limited, as previously noted, repeatedly infused capital into the business to keep it afloat. Docket 39-2, 37, 38, 42, and 43. In addition, the sole property owned by Lauer Limited was its hogs and any grain it had on hand at a given moment. Docket No. 39-2, 36. Lauer Limited did not own the finishing barns it utilized, any land, or any equipment, and there is no indication the members of Lauer Limited diverted the hogs or funds raised from sale of the hogs for their own purposes. Id.

Plaintiff does allege that Defendants Robert Lauer and David Hansen "took actions to improperly dispose of or sell pigs that were growing and destined to fulfill the requirements of Contracts," but the record does not support this allegation. Docket No. 26, 6. While Robert Lauer, acting on behalf of L and L Pork, did sell the hogs that Lauer Limited would have purchased if Lauer Limited had not dissolved, this was not yet Lauer Limited property. Docket No. 39-2, 26 and 36. It is also clear that Coleridge Grain, a majority of which was owned by Robert Lauer and David Hansen, purchased Lauer Limited's remaining hogs in December of 2010; but, as previously noted, those hogs were not slotted

to fulfill the Contracts here at issue. Docket No. 39-2, 39. In any event, Coleridge Grain continued to feed the hogs and delivered them to Plaintiff in fulfillment of other contracts Lauer Limited had with Plaintiff. Id.

Plaintiff also alleges, on information and belief, that "the feed and expenses for the hogs intended to fulfill the Contracts were commingled with those of L & L Pork, Robert Lauer and/or Coleridge Grain." Docket No. 26, 4. This is, in one sense, accurate. The record clearly indicates that Coleridge Grain acted as a food bank which often stored grain and other feed ingredients from various entities in the same facilities. Docker No. 39-2, 42. However, Robert Lauer testified that the grain and other feed ingredients of the various entities were separate in the sense that Coleridge Grain kept records of who owned what. Docket No. 39-2, 41 and 42. With fungible products, such as grain and other feed ingredients, this arrangement is entirely legitimate. Furthermore, there is absolutely no information of record indicating that either Coleridge Grain, L and L Pork, Robert Lauer, or any other entities owned by Dale Hansen were improperly usurping grain and other feed ingredients that ultimately belonged to Lauer Limited. Thus, the members of

Lauer Limited did not divert the funds or assets of Lauer Limited for their own purposes by ignoring corporate formalities.

However, it is a general principle of corporate law that owners of an insolvent entity "cannot participate in" even the legitimate "distribution of its assets until the claims of creditors are paid." <u>J.L. Brock Builders, Inc. v. Dahlbeck</u>, 391 N.W.2d 110, 116 (Neb. 1986) (quoting 15A W. Fletcher, Encyclopedia of the Law of Private Corporations § 7417, 137).

As stated in the Encyclopedia of the Law of Private Corporations:

> If the assets or capital [of an entity] are distributed to stockholders, either directly or <u>indirectly</u>, or if the stockholders are allowed to withdraw assets leaving creditors unpaid, they may be compelled to repay what they have received, at the suit of creditors . . . at least to the extent necessary to realize the ratable liability of each stockholder for corporate debts, if the company has not retained sufficient assets to pay its debts.

15 A W. Fletcher, Encyclopedia of the Law of Private Corporations § 7417, 137 (emphasis added).

While Plaintiff was not, strictly speaking, a creditor of Lauer Limited, Lauer Limited did, upon signing the Contracts, have an obligation to Plaintiff. Instead of fulfilling that obligation, Lauer Limited's members consciously decided to

38

fulfill all of its other obligations to the exclusion of Plaintiff. Docket No. 39-2, 54. Some of the obligations the members decided to make good on resulted in payments to individual members and other entities of which some of the members were part owners, resulting in both direct and indirect distributions to the members, while Tyson was left out in the cold.[14] Docket No. 39-2, 37, 38, 39, 42, and 43. Thus, the members of Lauer Limited, though they did not usurp Lauer Limited's assets or property by ignoring separateness of Lauer Limited, did use the dissolution process as an end around to divert what company funds were available to themselves and other entities of which they were part owners.

**d. Entity as a Mere Facade for the Personal Dealings of the Owners and Disregard of Corporate Formalities**

"The separate entity concept of" an entity "may be disregarded where the" entity "is a mere shell, serving no legitimate business purpose, and is used as an intermediary to perpetuate fraud on the creditors." Smith IV, 759 N.W.2d at

---

[14] Some examples include: (1) on December 30, 2010, Lauer Limited wrote a check to Coleridge Grain for $727,332.53 feed production; and (2) on December 30, 2010, Lauer Limited wrote a check to David Hansen for $167,917.38 for grain he had bought that was used by Lauer Limited. Docket No. 39-2, 37.

463.

After considering the record currently available, this Court is not persuaded that Lauer Limited qualifies as a mere facade for the personal dealings of its members. Lauer Limited was in the legitimate business of finishing hogs, and the record indicates the members put forth a good faith effort in executing that business. Unfortunately, the business proved unsuccessful. Furthermore, there is no indication that the members used Lauer Limited to their financial benefit and the detriment of those to whom they owed obligations. Though, they did succeed in diverting some company assets to themselves upon dissolution, the record supports the conclusion that these funds were paid as reimbursements for capital contributions or services. After all, in order to dissolve, Lauer Limited took out a $1,200,000.00 loan for which the members were individually liable, and Lauer Limited never reached a point where it was able to make distributions to individual members. Docket No. 39-2, 14 and 47.

### e. Conclusion

While the record does not indicate Lauer Limited was a mere facade established to facilitate the personal dealings of its members, it strongly indicates Lauer Limited was

40

undercapitalized, insolvent at the time it entered the Contracts with Tyson, and its dissolution was used to divert company assets back to individual members and entities the individual members owned to the detriment of Tyson. Therefore, Plaintiff has made a prima facie showing that Lauer Limited was under the actual control of its members and that those members exercised such control so as to commit a wrong in contravention of Tyson's rights. See J.L. Brock Builders Inc., 391 N.W.2d at 117-18 (holding that "[e]stablishing three of the four factors" for purposes of piercing the corporate veil "is sufficient . . . .").

### 3. Alter Ego Theory

Throughout these proceedings, Plaintiff has treated piercing the corporate veil and alter ego theory as synonymous doctrines. This Court, however, is persuaded the term "alter ego" is often used by courts in two incompatible senses. In one sense, courts refer to a subject entity whose corporate veil has been pierced as the "alter ego" of its shareholders. In the second sense, courts refer to a subject entity as the "alter ego" of another entity or individual, regardless of whether or not the other entity or individual has an ownership interest in the subject entity. This second sense is akin to

41

finding that the subject entity is acting as the mere agent or instrumentality of the individual or other entity at issue.

The distinction is important because piercing the corporate veil of a subject entity does not allow a court to impose liability on an individual or entity which is not an owner of the subject entity.[15] Once the corporate veil is pierced, the liable parties are revealed to be nothing more and nothing less than the shareholders/owners of the subject entity. However, under the alter ego/instrumentality approach, the emphasis is placed on whether a third party exercised sufficient control over the subject entity such that the subject entity is a mere agent or instrumentality of the

---

[15] This fact is inherent in the very nature of the test for piercing the corporate veil. For instance, a plaintiff "must allege and prove that" the target entity "was under the actual control of the shareholder[s] and that the shareholder[s] exercised such control to commit a fraud or other wrong in contravention of the plaintiff's rights." Christian, 276 Neb. at 883 (citing Baye, 260 Neb. 385) (emphasis added). In addition, the relevant factors to determine whether a fraud has been perpetrated include the capitalization of the entity, the relevant solvency of the corporation at the time the debt in question is incurred, the diversion of entity funds by shareholders, and whether the entity is a mere facade for the activities of shareholders, all of which are meant to determine whether the underlying owners of the entity should be held responsible for a wrong perpetrated by the entity and which are irrelevant to implicating a non-owner. J.L. Brock Builders, 223 Neb. at 498 (quoting United States Nat. Bank of Omaha v. Rupe, 207 Neb. 131, 135 (Neb. 1980)).

third party's interests, regardless of whether the third party owned a controlling interest in the subject entity.[16]

In this case, though Lauer Finishing, Coleridge Grain, and Lauer Limited have some shareholders in common, Lauer Finishing and Coleridge Grain do not own any interest in Lauer Limited.  Thus, in order for Plaintiff to establish that Coleridge Grain and Lauer Finishing's contacts are the contacts of Lauer Limited, it must establish that Lauer Limited was "organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, [or] adjunct" of Coleridge Grain and Lauer Finishing.  Hayes v. Sanitary and Imp. Dist. No. 194, 196 Neb. 653, 664 (Neb. 1976) (quoting 18 Am. Jur. 2d, Corporations, § 17, 565).

After thorough review of relevant case law from a number of jurisdictions, this Court has found that it is quite rare for a Plaintiff to argue, as here, that a subject entity that is not owned, at least in part, by a third party is in fact

---

[16] Though it is not necessary that the third party own a controlling interest in the subject entity, this is still obviously relevant to a determination of whether the subject entity was in fact a mere instrumentality or agent of the third party.

the third party's alter ego.[17]  Plaintiff does, however, cite

some Eighth Circuit case law supporting its argument.    In

Lakota Girl Scout Council, Inc. v. Havey Fund-Raising

Management Inc., the Eighth Circuit stated that "[e]ven a non-

owned corporation" may be deemed the alter ego of another.

Lakota Girl Scout Council, Inc. v. Havey Fund-Raising

Management, Inc., 519 F.2d 634, 637 (8th Cir. 1975).  However,

the Lakota Girl Scout Council Court was considering whether

the contacts of an individual shareholder could be considered

the contacts of an entity he predominantly owned, and so,

---

[17] The only two cases, including those cited by Plaintiff,
this Court found in which a subject entity was determined to
be the alter ego of a third party, which did not have an
ownership interest in the subject entity, was from a district
court in the Eastern District of Missouri in Greater St. Louis
Const. Laborers Welfare Fund v. Mertens Plumbing and
Mechanical, Inc., and a Nebraska Supreme Court decision,
Ehlers v. Bankers' Fire Ins. Co., 552 F. Supp. 2d 952 (E.D.
Mo. 2007) and 108 Neb. 756 (Neb. 1922).  Given the state of
case law, this Court strongly considered ruling that alter ego
theory simply does not apply to an entity that is not, at
least in part, owned by a third party.  When, as here, there
are some overlap in common owners between a subject entity and
a third party entity, but the third party entity does not own
an interest in the subject entity, the subject entity's
corporate veil could still be pierced to hold the common owner
of the two entities liable, and his ownership interest in the
third party entity could then become the subject of additional
proceedings necessary for satisfaction of any judgment.
However, in the context of a single individual or a small
group of individuals who together own several entities, though
the entities have no ownership interest in each other, such as
here, this Court is persuaded that alter ego theory may be
applicable.

though the Court stated alter ego/instrumentality theory could apply to "[e]ven a non-owned corporation," a non-owned corporation was not directly under consideration. 519 F.2d at 637. Plaintiff also cites the Eighth Circuit's decision in Epps v. Stewart Information Services Corp., which cites the Lakota Girl Scout Council Court's opinion in detail. 327 F.3d 642 (8th Cir. 2003). However, the Epps Court was considering whether a subsidiary's contacts could be considered the contacts of its parent, and so Epps too does not squarely consider the fact pattern under consideration here. Id.

Further complicating matters, Plaintiff has failed to cite case law employing Nebraska law.[18] However, in Ehlers v. Bankers' Fire Ins. Co., a case in which two entities had the same underlying ownership, though neither entity owned an interest in the other, the Supreme Court of Nebraska stated that a "Court of equity will not permit mere corporate forms to serve as a cloak and shield to the perpetration of a fraud, but will examine the whole transaction, looking through corporate forms to the substance of things, to protect the rights of the innocent parties." Ehlers v. Bankers' Fire Ins. Co., 108 Neb. 756 (Neb. 1922). In Hayes v. Sanitary and Imp.

---

[18] As previously noted, Nebraska law is controlling.

45

Dist. No. 194, the Supreme Court of Nebraska also stated that "the notion of separate corporate existence of . . . affiliated corporations will not be recognized" in certain circumstances. 196 Neb. 653, 664 (Neb. 1976) (quoting 18 Am.Jur.2d, Corporations, § 17, 565). An affiliate generally refers to a parent, subsidiary, or sibling or sister entity. Blacks Law Dictionary, (9th ed.), affiliate. A parent is an entity "that has a controlling interest in another" entity; a subsidiary is an entity "in which a parent" entity "has a controlling share;" and sibling or sister entities are entities "controlled by the same, or substantially the same, owners." Black's Law Dictionary (9th ed.), corporation. Id. As previously noted, Lauer Limited was owned by Robert Lauer, David Hansen, Dale Hansen, Roy Miller, and James Kuchta; Coleridge Grain, during the relevant time period, was owned by Robert Lauer, David Hansen, and Brian Eddie; and Lauer Finishing is owned by Robert Lauer and his wife. Thus, in the sense that each entity shares common owners, they are sibling or sister entities and, according to the Supreme Court of Nebraska in Hayes and Ehlers, alter ego theory may apply.

Under Nebraska law, though a third party entity may be held liable for the actions of a sibling entity, the test for determining whether such liability lies has not been developed. Again, Plaintiff has not cited any case law involving Nebraska law on point, and, after a thorough search, this Court was unable to find any.

In <u>Epps</u>, the Eighth Circuit stated that there is "[n]o all embracing rule" for determining "the relationship between two" entities. 327 F.3d at 649. "The circumstances in each case must be examined to determine whether" an entity "through the activities of another" entity "has subjected itself to" the jurisdiction of a particular forum. <u>Id.</u> In <u>Greater Kansas City Laborers Pension Fund, Inc.</u>, the Eighth Circuit stated that "the alter ego doctrine . . . provides that the legal fiction of" a separate entity "may be rejected in the case of" an entity "that (1) is controlled by another to the extent that it has independent existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetrate fraud." <u>Greater Kansas City Laborers Pension Fund v. Superior General Contractors, Inc.</u>, 104 F.3d 1050, 1055 (8th Cir. 1997). <u>Id.</u> In <u>HOK Sport Inc. v. FC Des Moines, L.C.</u>, the Eighth Circuit indicated that a

subject "entity is the alter ego of" another entity "if (1) the" other entity "influences and governs the" subject "entity; (2) a unity of interest and ownership exists such that the" subject "entity and the" other entity "cannot be separated; and (3) giving effect to the fictional separation between the" subject entity and the other entity "would 'sanction a fraud or promote injustice.'"[19] 495 F.3d 927, 935 (8th Cir. 2007).

**a. Whether Coleridge Grain and Lauer Finishing Control and Have a Sufficient Unity of Ownership with Lauer Limited Such That Lauer Limited has an Independent Existence in Form Only**

As previously noted, Robert Lauer, David Hansen, Dale Hansen, Roy Miller, and James Kuchta were the members of Lauer Limited. Docket No. 26, 3. Though certain members of Lauer Limited took on additional responsibilities, the record indicates they each had equal decision making authority. Docket No. 32-2, 11. Robert Lauer, David Hansen, and Brian

_____

[19] <u>HOK</u> involved the question of whether a non-profit organization could be considered the alter ego of its sole shareholder. Regardless, this Court is persuaded the Eighth Circuit standard announced in <u>HOK</u> is appropriate whether the subject entity and the other entity or individual under consideration own an interest in each other or simply have common underlying ownership.

Eddie each had an equal 1/3 interest in Coleridge Grain. Docket No. 39-2, 6. Dale Hansen, Roy Miller, and James Kuchta, who together owned a majority interest in Lauer Limited, had no interest in Coleridge Grain; and Brian Eddie had no interest in Lauer Limited. Additionally, Robert Lauer and his wife are the sole owners of Lauer Finishing and L and L Pork. Dale Hansen, David Hansen, Roy Miller, and James Kuchta did not have an ownership interest in Lauer Finishing or L and L Pork. Thus, though Lauer Limited has common owners with Coleridge Grain, Lauer Finishing, and L and L Pork, the unity of ownership was never complete; in fact, none of the entities shared the same blocks of majority ownership.

Alter ego theory requires that the subject entity (Lauer Limited) be influenced and controlled by the third party entity (Coleridge Grain, L and L Pork, and Lauer Finishing), not vice versa. <u>HOK Sport</u>, 495 F.3d at 935. This is an important distinction because a third party sister or sibling entity may have owners who have no interest in the subject entity, making it particularly harsh, and perhaps unfair, to hold the third party sister or sibling entity responsible for the subject entity's actions. In this case, neither Bob Eddie, 1/3 owner of Coleridge Grain, nor Robert Lauer's wife,

1/2 owner of Lauer Finishing, had any ownership interest in Lauer Limited.  It would require exceptional circumstances for this Court to rule that an entity of which they (Bob Eddie and Sylvia J. Lauer) are part owners may be held responsible for Lauer Limited's liability to Plaintiff.

While it makes sense to say a third party sister or sibling entity that controls a subject entity shares the subject entity's contacts, the reverse does not hold true.  As an example, the law will sometimes hold a parent responsible for the actions of their child, but the law never holds a child responsible for the actions of their parent.

While some of the owners of Lauer Limited had a controlling interest in Coleridge Grain and Lauer Finishing, the owners of Coleridge Grain and Lauer Finishing simply did not have a controlling interest in Lauer Limited.  In this sense, it was Lauer Limited, not Coleridge Grain and Lauer Finishing, that had the formal ability to exercise influence and control within the relationship.  Though this Court is persuaded that alter ego theory does not live or die by the scheme of actual, underlying ownership, a plaintiff should at least be able to point to some evidence indicating how an entity with underlying ownership that also makes up a minority

interest in a subject entity would be able to dictate the actions of the subject entity. However, in this case, the evidence indicates that the formal ownership of the various entities correlated with the actual control brought to bear; that is, Lauer Limited exercised control over its sister and sibling entities and not vice versa.

For example, Lauer Limited was able to utilize Coleridge Grain's feed processing services without paying their bills in a timely manner. Docket No. 39-2, 43. As the Plaintiff even noted, Coleridge Grain's practice of providing large amounts of feed to Lauer Limited without collecting payment therefore effectively provided "Lauer Limited with working capital" that would have otherwise not been available. Docket No. 26, 8. Clearly, this arrangement was beneficial to Lauer Limited, not Coleridge Grain.

In addition, Lauer Limited paid Lauer Finishing $19,000.00 per month rent for use of its finishing barns. Docket No. 23-13, 6. There is no reason to believe that this amount was excessively high, or that Lauer Finishing, through Robert Lauer, was able to exercise control over Lauer Limited. In order to do so, Lauer Finishing would have had to convince Dale Hansen, David Hansen, Roy Miller, and James Kuchta, all

of whom had an equal say in running Lauer Limited, to give up something for nothing.

Furthermore, the relationship between L and L Pork and Lauer Limited provides perhaps the most striking example of Lauer Limited's ability to exercise control over its sibling or sister entities.[20] The contract between L and L Pork and Lauer Limited called for Lauer Limited to pay L and L Pork $28 per hog. Docket No. 39-2, 7. Though the contract expired in 2004, the record supports the fact that the parties continued to follow the terms of the contract, excepting a $2 per hog increase sometime after 2004. Docket No. 39-2, 7 and 8. However, when L and L Pork began selling hogs to an unrelated, third party upon Lauer Limited's dissolution in 2010, it sold them for $40 per head, indicating the arrangement between L and L Pork and Lauer Limited favored Lauer Limited. Docket No. 39-2, 27. In addition, the contract between Lauer Limited and L and L Pork provided that Lauer Limited was to earn at least $3 per pig, suggesting that if Lauer Limited did not earn at least $3 per pig, the price L and L Pork received

---

[20] As previously noted, Defendant's motion to dismiss for lack of personal jurisdiction does not apply to L and L Pork. However, since L and L Pork's relationship with Lauer Limited was similar to Lauer Finishing's relationship with Lauer Limited, L and L Pork is relevant.

would go down. Docket No. 39-2, 8-10. L and L Pork also provided some of Lauer Limited's labor free of charge and gave Lauer Limited over $1,900,000 worth of loans over a two year period. Docket No. 39-2, 28.

The Plaintiff has presented a report from a Mr. Robert L. Kirchner, a Certified Fraud Examiner. Docket No. 23-13 (Exhibit J). After reviewing the corporate records of Lauer Limited, L and L Pork, Coleridge Grain, and Lauer Finishing, Mr. Kirchner concluded:

> Lauer Limited, L & L Pork, and Lauer Finishing violated corporate separateness, ignored corporate formalities, com[m]ingled money and other critical assets, engaged in non-arm's length transactions, and operated as one entity. As between Lauer Limited and Coleridge Grain, these entities also violated corporate separateness, ignored corporate formalities, com[m]ingled money and other critical assets, and engaged in non-arm's length transactions.

Docket No. 23-13, 1.

As an initial matter, it should be noted that Mr. Kirchner is not an attorney and claims no special knowledge of farming practices. Docket No. 30-3, 119. After reviewing Mr. Kirchner's opinion, it is apparent it was based upon the same information this Court has already thus far considered. Docket No. 23-13.

While this Court agrees that Lauer Limited and its sister or sibling entities often ignored corporate formalities, engaged in some non-arms length transactions, and to some degree ignored entity separateness, they did so because Lauer Limited was able to exercise influence and control over Coleridge Grain, Lauer Finishing, and L and L Pork and not vice versa. Nearly every transaction between Lauer Limited and Coleridge Grain, L and L Pork, and Lauer Finishing inured to the benefit of Lauer Limited.

Furthermore, this Court rejects Mr. Kirchner's legal conclusion that Lauer Limited, L and L Pork, and Lauer Finishing operated as a single entity. Though the divisions between each entity were often blurred due to Lauer Limited's influence over the other entities, it is undisputed that Lauer Limited ultimately paid rent to both L and L Pork and Lauer Finishing for use of their buildings; that Lauer Limited paid for the hogs produced by L and L Pork; and that Lauer Limited paid for Coleridge Grains' services. Single entities do not pay their left hand with their right unless the exchange has little to no actual consequences, which was not the case here. It is undisputed that Lauer Limited's payments made to Lauer Finishing and L and L Pork did not benefit 4/5 of Lauer

Limited's members, and that Lauer Limited's payments to Coleridge Grain did not benefit 3/5 of Lauer Limited's members; this, rather than the level of formality and sophistication of their agreements, is the true hallmark of separate corporate existence.

In conclusion, to the extent that Lauer Limited, Coleridge Grain, Lauer Finishing, and L and L Pork operated as a single entity, they did so because Lauer Limited had control and influence over Coleridge Grain, Lauer Finishing, and L and L Pork. If anything,[21] Coleridge Grain, Lauer Finishing, and L and L Pork were the alter egos of Lauer Limited and not vice versa. As previously noted, a third party sister or sibling entity controlled by a subject entity generally will not be held responsible for the subject entity's actions, especially when the third party sister or sibling entity involves minority owners who have no interest in the subject entity, such as here. Therefore, Plaintiff has failed to make a prima facie showing that the exercise of jurisdiction over Coleridge Grain and Lauer Finishing is appropriate based on alter ego

------

[21] This Court does not conclude that Coleridge Grain, Lauer Finishing, and L and L Pork were in fact the alter egos of Lauer Limited but merely that Lauer Limited had formal control and often exercised actual control over the other entities to some extent.

theory.  **Thus, Plaintiff's breach of contract and unjust enrichment causes of action against Coleridge Grain, and all of Plaintiff's claims against Lauer Finishing, are hereby dismissed**.

### E.  Intentional Interference with Contract

As previously noted, Plaintiff's intentional interference with contract claim has only been brought against Defendants L & L Pork, Coleridge Grain, David Hansen and Robert Lauer.[22] Docket No. 26.  Defendants L & L Pork, Robert Lauer, and David Hansen have not filed a motion to dismiss for lack of personal jurisdiction.  Thus, the sole question here is whether this Court can exercise personal jurisdiction over Coleridge Grain as to Plaintiff's intentional interference with contract cause of action.

Plaintiff contends this Court has personal jurisdiction over Coleridge Grain pursuant to the Supreme Court test announced in Calder v. Jones.  465 U.S. 783 (1984).  However, prior to considering Plaintiff's argument, this Court will

---

[22] Plaintiff has subsequently implied that all of the newly added Defendants intentionally interfered with the Contracts, but Plaintiff has not formally motioned this Court to amend their complaint to include all newly added Defendants to this count.  Docket No. 44, 9 fn. 7.

briefly consider whether this Court may exercise general jurisdiction over Coleridge Grain.

### 1. General Jurisdiction

As previously noted, general jurisdiction occurs when, though the suit may not arise out of a defendant's contacts with the forum, the defendant's independent contacts with the forum are so "continuous and systematic" that the exercise of personal jurisdiction as to any cause of action remains justified. Helicopteros, 466 U.S. at 414.

Again, Coleridge Grain "is a Nebraska Limited Liability Corporation with its principal place of business in Coleridge, Nebraska." Docket No. 26,3. It is undisputed that Coleridge Grain, on behalf of Lauer Limited, delivered Lauer Limited's hogs to Plaintiff's facility in Storm Lake, Iowa. Docket No. 34-1, 30. However, this is the only general contact Plaintiff alleges Coleridge Grain had with Iowa. See Docket No. 26. After careful consideration, this Court is persuaded that Coleridge Grain's contacts with the State of Iowa are insufficient to subject it to the general jurisdiction of this Court. See Johnson v. Arden, 614 F.3d 785, 795 (8th Cir. 2010) (stating that the occasional delivery of goods does not constitute continuous or systematic contacts) and Felch v.

<u>Transporters Lar-Mex SA DE CV</u>, 92 F.3d 320, 328 (5th Cir. 1996) (stating that Plaintiff failed to establish that the delivery of goods into the forum was "sufficiently substantial such that the exercise of jurisdiction on a general jurisdiction basis comported with the requirements of the due process clause").

### 2. The <u>Calder</u> Effects Test

In <u>Calder v. Jones</u>, the Supreme Court considered whether a California plaintiff could maintain a cause of action against Florida defendants for writing and editing an allegedly libelous article which was sold in California. 465 U.S. 783, 784-85 (1984). One of the <u>Calder</u> defendants had only been to California on two occasions: once on a pleasure trip prior to publication of the article at issue, and once to testify in an unrelated trial. <u>Id.</u> at 786. The Supreme Court ultimately determined that jurisdiction against the defendants was proper because they engaged in "intentional conduct . . . calculated to cause injury" in California. 465 U.S. 783, 791 (1984). In doing so, the <u>Calder</u> Court noted that defendants' "intentional, and allegedly tortious, actions were expressly aimed at California," and "they knew that the brunt of the

injury would be felt by" the plaintiff in California. _Id._ at 789.

The Eighth Circuit, rather than viewing _Calder_ as announcing independent grounds for a finding of personal jurisdiction, has stated that it merely "requires the consideration of additional factors . . . ." _Dakota Industries, Inc._, 946 F.2d 1384, 1391 (8th Cir. 1991). However, the Eighth Circuit has subsequently indicated that

> [a] defendant's tortious acts can serve as a source of personal jurisdiction [under _Calder_] . . . where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were 'uniquely' or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered-and which the defendant knew was likely to be suffered-there.

_Lindgren v. GDT, L.L.C._, 312 F. Supp. 2d 1125, 1132 (S.D. Iowa 2004) (quoting _Zumbro Inc. v. Cal. Natural Prods._, 861 F. Supp. 773, 782-83 (D. Minn. 1994) (Kyle J.)).

After a thorough review of the record, this Court is persuaded that Plaintiff has failed to allege sufficient facts to show that Coleridge Grain's actions were uniquely or expressly aimed at the State of Iowa. Coleridge Grain did request payment for its feed processing services, and this no doubt contributed to Lauer Limited's inability to meet its obligations to Plaintiff. Docket No. 39-2, 37. However, this

request was uniquely and expressly aimed at Lauer Limited within the State of Nebraska, not the Plaintiff's plant in Iowa. Any effect such a request may have had on Plaintiff's Contracts, and Plaintiff's facility in Storm Lake, Iowa, was collateral and not uniquely or expressly aimed at the Plaintiff in Iowa. As previously noted, in <u>Calder</u>, the Defendants were directing libelous statements at the Plaintiff in the Plaintiff's home forum. 465 U.S. 783, 784-85. In this case, Coleridge Grain merely requested payment for its services provided in Nebraska from a Nebraska entity. Docket No. 39-2, 37 and 54. There is no indication its bill was made intentionally or improperly exorbitant in order to harm Plaintiff's interests; in fact, the record indicates Coleridge Grain allowed Lauer Limited's bill to slide for a number of years, which, if anything, allowed Lauer Limited to comply with pre-existing contracts with Plaintiff.[26] Docket No. 39-2,

_____

[26] Even if this Court's analysis is wrong and Coleridge Grain's request for payment for services rendered was somehow expressly or uniquely aimed at Plaintiff within the State of Iowa, it was not improper or unjustified. Under both Iowa and Nebraska law, there is no cause of action for intentional interference unless the defendants' actions in question are in some manner "improper" or "unjustified." <u>In re Quality Processing, Inc.</u>, 9 F.3d 1360, 1364 (8th Cir. 1993) (citing <u>Matheson v. Stork</u>, 239 Neb. 547, (1991)); and <u>Jones v. Lake Park Care Center, Inc.</u>, 569 N.W.2d 369, 377 (Iowa 1997). "A party is justified in interfering with a third party's contract if it 'asserts in good faith a legally protected

43.

Plaintiff also alleges that Coleridge Grain caused Lauer Limited to be inappropriately capitalized, which, if true, would no doubt effect Lauer Limited's ability to meet its obligations to Plaintiff. Docket No. 26, 12. However, this Court simply does not comprehend how Coleridge Grain was able to effect Lauer Limited's capitalization. Docket No. 26, 13. Only the underlying owners of an entity may be held responsible for determining the entity's capitalization.

The Plaintiff also contends Coleridge Grain purchased hogs from Lauer Limited that were slated to fulfill contracts with Plaintiff. Docket No. 26, 12. However, the hogs Coleridge Grain purchased were later applied to fulfill pre-existing contracts Lauer Limited had with Plaintiff and did

interest of its own . . . .'" <u>In re Quality Processing, Inc.</u>, 9 F.3d at 1365 (quoting Restatement (Second) of Torts § 773); <u>see</u> <u>also</u> <u>Berger v. Cas' Feed Store, Inc.</u>, 543 N.W.2d 597, 599 (Iowa 1996) ("'[I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.'") (quoting Restatement (Second) of Torts § 767 cmt. d).

not affect the Contracts here at issue.  Docket No. 39-2, 39 and Docket No. 51, 3.

**Therefore, Plaintiff has failed, either through an exercise of general jurisdiction, alter ego theory, or the Calder effects test, to make a prima facie showing that Coleridge Grain is subject to this Court's jurisdiction, and all Plaintiff's causes of action against Coleridge Grain are hereby dismissed.**

## IV.  IMPROPER VENUE

As previously noted, all named Defendants contend that this Court is an improper venue and dismissal is appropriate pursuant to Federal Rule of Civil Procedure 12(b)(3).  Docket No. 30 and 31.  28 U.S.C. Section 1391(b), the applicable federal venue statute, provides:

> A civil action may be brought in -
> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the

court's personal jurisdiction with respect
to such action.

Under 28 U.S.C. Section 1391(b), a court should not "ask
which of two or more potential forums is the 'best' venue . .
. ." Setco Enterprises, Corp. v. Robbins, 19 F.3d 1278, 1281
(8th Cir. 1994). Rather, the question is whether a
plaintiff's chosen forum has "a substantial connection to the
claim . . . ." Id.

Plaintiff contends that courts making venue
determinations in contract disputes look "to such factors as
where the contract was negotiated or executed, where it was to
be performed, and where the alleged breach occurred." Docket
No. 30-1, 12 (citing Gulf Ins. Co. v. Glasbrenner, 417 F.3d
353, 357 (2d Cir. 2005)) and *Wright & Miller,* Federal Practice
and Procedure §3806.1. While it is undisputed that the
negotiation and much of the execution of the Contracts
occurred in Nebraska, the performance and breach of the
Contracts occurred in Iowa.

In arguing that performance of the Contracts took place
in Nebraska, Defendants note that Lauer Limited purchased and
raised their hogs in Nebraska, but this is the execution of
the Contract, not the performance. The Contracts at issue did
not require Lauer Limited to purchase and raise hogs in a

certain manner, they simply required Lauer Limited to deliver hogs to Plaintiff's plant in Storm Lake, Iowa, and then spelled out the terms whereby Plaintiff would be compensated. Clearly, the Contracts were to be performed in the State of Iowa; and "the place of performance is a proper venue for breach of contract claims." Zack's Famous Frozen Yogurt, Inc. v. Swanner, 1988 WL 86793, 2 (E.D. La. 1988).

In discussing where the alleged breach occurred, Defendants contend that it occurred at Plaintiff's hog buying facility in Laurel, Nebraska, when Robert Lauer informed Plaintiff's buying agent that Lauer Limited would not be able to fulfill the contracts. Docket No. 30-1, 13. While Defendants' argument has a simplistic appeal, legally speaking, a breach of contract occurs where performance was to take place but did not. See Great Rivers Cooperative of Southeastern Iowa v. Farmland Industries, Inc., 934 F. Supp. 302, 305 (S.D. Iowa 1996) (stating that a breach of contract claim "originates where the performance should have taken place, but did not"). Thus, Lauer Limited's breach of contract occurred in Iowa.

Finally, 28 U.S.C. Section 1381(b) specifically provides that venue is proper not only where a substantial part of the

"events" occurred but also where a substantial part of the "omissions" occurred. It seems clear to this Court that relevant omissions would include a failure to perform within a forum under the terms of a valid contract, such as occurred here. It also seems clear that, in a breach of contract cause of action, a failure to perform is as substantial an omission as can be made. **Thus, in as far as it is undisputed that Lauer Limited breached its Contracts to deliver hogs to Plaintiff's facility in Storm Lake, Iowa, this Court is a proper venue**.

## V.  CHANGE OF VENUE

Defendant also requests transfer of venue pursuant to 28 U.S.C. § 1404(a), which provides:

> [f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . .

The primary purpose of § 1404(a) is to provide a district court discretion to transfer venue for reasons of convenience and fairness "despite the propriety of the plaintiff's venue selection." <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 634 (1964). The Eighth Circuit has recognized that "considerable deference" is given "to a plaintiff's choice of forum," and,

therefore, the "party seeking a transfer under section 1404(a) typically bears the burden of proving that a transfer is warranted." In re Apple, Inc., 602 F.3d 909, 913 (8th Cir. 2010).

A court should consider "the convenience of the parties, the convenience of witnesses, [and] the interests of justice," as well as any other relevant factors. Terra Intern., Inc. v. Mississippi Chemical Corp., 119 F.3d 688, 696 (8th Cir. 1997). Under the general category of "Convenience," a court should consider . . .

> (1) the convenience of the parties, (2) the convenience of the witnesses – including the willingness of witnesses to appear, the ability to subpoena witnesses, and the adequacy of deposition testimony, (3) the accessibility to records and documents, (4) the location where the conduct complained of occurred, and (5) the application of each forum state's substantive law.

Id. at 696.

Under the general category "Interest of Justice," a court should consider:

> (1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6) conflict of law issues, and (7) the advantages of having a local court determine questions of local law.

66

<u>Id.</u>

In support of its Motion for Change of Venue, Defendant focuses on the convenience of the parties, the convenience of the witnesses, the location of the documentary evidence, and judicial efficiency. Docket No. 30-1, 16-19.

As to the convenience of the parties, all parties concerned, with the exception of Dale Hansen, are closer to the courthouse in Sioux City, Iowa, than any other federal courthouse. Docket No. 34-1. Therefore, Plaintiff's choice of venue is greatly superior to any alternate venues.

As to the convenience of the witnesses, Defendants fail to identify any specific non-party witness they would like to call who resides closer to another venue. In order to be successful in a motion to change venue, "'the party seeking the transfer must clearly specify the essential witnesses to be called and must make a general statement of what their testimony will cover.'" <u>Medicap Pharmacies, Inc. v. Faidley</u>, 416 F. Supp. 2d 678, 687 (S.D. Iowa 2006). Though the Defendants insinuate they will need to call bankers and accountants associated with their business interests in order to defend themselves, they have given this Court no reason to believe that those bankers or accountants will not live near

the Defendants, who, as previously noted, live closer to the Sioux City courthouse than other potential courthouses.

The Defendants do note that Plaintiff's witnesses reside outside this district, but, while this is true, most of them are still closer to this venue. Furthermore, a "question of the accessibility of witnesses depends upon whether those witnesses will willingly appear, and whether alternative means of producing their testimony exist." <u>Terra Int'l Inc. v Miss. Chem. Corp.</u>, 922 F. Supp. 1334, 1360 (N.D. Iowa 1996). It is reasonable to assume that if Plaintiff would have any difficulty procuring its own witnesses, they would not have chosen this forum. Finally, as noted by Defendant, "all essential non-party fact witnesses identified to date are located within this Court's subpoena range."[27] Docket No. 34, 20.

As to judicial economy, because this Court has already invested a substantial amount of time in determining whether this Court has personal jurisdiction, a transfer of venue, at this juncture, may require another district court to retrace this Court's steps. Though the Defendants note that an

---

[27] Pursuant to Federal Rule of Civil Procedure 45(b)(2), a federal subpoena may be issued to anyone within the district of the issuing court or within 100 miles of the courthouse.

enforcement of this Court's judgment would require an additional action in Nebraska, the burden of this enforcement action would pale in comparison to the burden already imposed upon this Court in answering the questions raised by the parties' arguments.

**For the above reasons, Defendants' motion for change of venue is hereby denied.**

VI.  CONCLUSION AND SUMMARY

**The newly added Entity Defendants'[28] Motion to Dismiss Due to Lack of Personal Jurisdiction is hereby granted as to Defendants Lauer Finishing and Coleridge Grain.  Lauer Limited is not the alter ego of Lauer Finishing and Coleridge Grain; and Coleridge Grain is not subject to the personal jurisdiction of this Court pursuant to the Calder effects test.**

**The newly added Member Defendants' (Dale Hansen, Roy Miller, and James Kuchta) Motion to Dismiss Due to a Lack of Personal Jurisdiction is hereby denied.[28]  Plaintiff has made**

---

[28] The Original Entity Defendants, Lauer Limited and L and L Pork, have not filed a Motion to Dismiss Due to a Lack of Personal Jurisdiction.

**a prima facie showing that Lauer Limited's corporate veil may be pierced; and, therefore, because this Court has personal jurisdiction over Lauer Limited, this Court has personal jurisdiction over Lauer Limited's newly added member Defendants.[29]**

**The causes of action remaining before this Court are: (1) Plaintiff's breach of contract cause of action against Lauer Limited, L and L Pork, Robert Lauer, David Hansen, Dale Hansen, Roy Miller, and James Kuchta; (2) Plaintiff's unjust enrichment cause of action against Lauer Limited, L and L Pork, Robert Lauer, David Hansen, Dale Hansen, Roy Miller, and James Kuchta; and (3) Plaintiff's intentional interference with contract cause of action against L and L Pork, David Hansen, and Robert Lauer.**

**All Defendants' Motion to Dismiss for Lack of Venue is hereby denied; and all Defendant's Motion for Transfer of Venue is hereby denied.**

---

[29] The Original Member Defendants, Robert Lauer and David Hansen, have not filed a Motion to Dismiss Due to a Lack of Personal Jurisdiction.

**IT IS SO ORDERED** this 16th day of January, 2013.

_____

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa